**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JADE HENEY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-2463** |
| **ENTERGY OPERATIONS, INC., ET AL.** | **SECTION "O"** |

## ORDER AND REASONS

In this nuclear power plant workplace gender discrimination case, Plaintiff Jade Heney additionally seeks to recover damages for a negligently administered drug test that effectively led not only to her termination for "subversion" but also resulted in revocation of her Unescorted Access Authorization, thus effectively depriving her of employment opportunities in the nuclear field. Before the Court are two Rule 12(b)(6) motions to dismiss: one[1] by Ms. Heney's former employer, Defendant Entergy Operations, Inc. ("Entergy") in which Entergy seeks (partial) dismissal of Plaintiff's state-law claims for negligence, *respondeat superior,* and spoliation; and one[2] by Defendant Thelma Jenny Kraemer, the employee who administered the drug test, who seeks dismissal of the singular negligence claim brought by her former co-worker against her. For the following reasons, the motions to dismiss will be **GRANTED IN PART and DENIED IN PART**.

---

[1] ECF No. 36.
[2] ECF No. 43.

## I.     BACKGROUND

Jade Heney was fired from her job at a nuclear power plant for subverting a random urinalysis. Her urine was collected by a co-worker as part of a federally-mandated drug test to ensure safety in the nuclear facility where they worked. Aggrieved by her termination and her former employer's publication of the revocation of her Unescorted Access Authorization, a *sine qua non* of working in the nuclear field, Ms. Heney brought this lawsuit against her former employer and colleague, challenging irregularities in the random urinalysis test and failures of the review process that followed.

In her twice amended lawsuit, Jade Heney seeks redress for workplace discrimination as well as for the collateral consequences of a negligently administered drug test, which she claims led to her wrongful termination and permanent revocation of Unescorted Access Authorization, a prerequisite for employment in the nuclear industry.[3] Because Entergy does not challenge the plausibility of Ms. Heney's gender discrimination allegations comprising her first (Title VII) and second (Louisiana Employment Discrimination Law) causes of action, this background section forgoes a detailed summary of Ms. Heney's specific allegations based on her theory of recovery that "her employment was marred by incessant, unwanted sexual harassment by multiple supervisors and male co-workers."[4] To resolve the defendants' Rule 12(b)(6) motions to dismiss targeting Ms. Heney's negligence claims (against both defendants) and *respondeat superior* and spoliation claims (against

---

[3] ECF No. 32 (Second Amended Complaint).

[4] *See id.* ¶ 1; *see also id.* ¶¶ 15-62.

Entergy), the Court limits its summary to the second amended complaint's well-pleaded facts, which the Court takes as true and considers in the light most favorable to Ms. Heney. *See generally Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 190 (5th Cir. 2009).

*The Workplace: Waterford 3 Nuclear Facility*

Entergy operates Waterford 3, a nuclear power plant facility in Killona, Louisiana. To ensure that nuclear facilities are safely and securely operated, to protect the public from catastrophe, operators of nuclear power plants must follow the requirements of federal nuclear laws, as well as implementing regulations promulgated by the U.S. Nuclear Regulatory Commission (the "Commission"). Accordingly, nuclear sites like Waterford 3 are subject to federal agency regulation and oversight.[5]

As Waterford 3's operator, Entergy holds and must maintain licensing from the Commission.[6] This regulatory backdrop—derived from the second amended complaint's allegations and the regulations themselves of which the Court takes judicial notice—provides critical context for the negligence causes of action Defendants presently challenge.

Governing regulations oblige operators like Entergy and facilities like Waterford 3 to "implement drug and alcohol testing programs" to "deter and detect substance abuse." 10 C.F.R. § 26.31(a). To comply with this obligation, licensees like Entergy must limit and control personnel access to Waterford 3 by implementing and

---

[5] *See id.* ¶¶ 7, 105.
[6] *Id.* ¶¶ 12, 105.

3

maintaining "internal review frameworks that operate in tandem[:]"[7] a "fitness-for-duty" ("FFD") program, 10 C.F.R. § 26.23, and an "access authorization program," 10 C.F.R. § 73.56.

The "access authorization program must provide high assurance that the individuals [granted unescorted access authorization ('UAA')] are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security[.]" 10 C.F.R. § 73.56(c). Only if an employee submits to a background investigation, psychological assessment, and routine drug and alcohol testing can she obtain UAA. 10 C.F.R. §§ 26.65, 73.56. Once granted, unrestricted access is subject to monitoring. Working in tandem with the access authorization program, the FFD program seeks to "provide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse," "provide reasonable measures for the early detection of individuals who are not fit to perform the duties that require them to be subject to the FFD program," and screens for employees "under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." 10 C.F.R. § 26.23(a)-(c).

A Medical Review Officer ("MRO"), who must be a physician and who may be an employee of the licensee, plays a role with regard to testing oversight and FFD issues and violations. 10 C.F.R. § 26.183. The MRO's "primary role" "is to review and

---

[7] *See generally Greene v. Entergy Operations, Inc.*, No. 24-60603, 2025 WL 2237365, at *1 (5th Cir. Aug. 6, 2025).

interpret positive, adulterated, substituted, invalid, and dilute test results obtained through the licensee's or other entity's testing program and to identify any evidence of subversion of the testing process." 10 C.F.R. § 26.183(c). Additionally, the MRO has general oversight in advising and assisting FFD program management and "is responsible for identifying any issues associated with collecting and testing specimens[.]" *Id.*

Yet another feature of the Commission's security requirements is information sharing: the Personnel Access Data System ("PADS") is a database the nuclear industry utilizes to facilitate information sharing about persons who have been granted or denied UAA. 10 C.F.R. § 73.56(d)(4)(v).[8] This information-sharing has consequences. For example, if an individual is denied UAA by one licensee, another may not grant that individual access. *See* 10 C.F.R. § 73.56(h)(3).[9]

---

[8] Specifically, this subsection (d)(4)(v) provides:

When any licensee, applicant, contractor, or vendor is seeking the information required for an unescorted access or unescorted access authorization decision under this section and has obtained a signed release from the subject individual authorizing the disclosure of such information, other licensees, applicants, contractors and vendors shall make available the personal or access authorization information requested regarding the denial or unfavorable termination of unescorted access or unescorted access authorization.

[9] This subsection (h)(3) provides:

Access denial. Licensees or applicants may not permit an individual, who is identified as having an access-denied status by another licensee subject to this section, or has an access authorization status other than favorably terminated, to enter any nuclear power plant protected area or vital area, under escort or otherwise, or take actions by electronic means that could adversely impact the licensee's or applicant's safety, security, or emergency response or their facilities, under supervision or otherwise, except upon completion of the initial unescorted access authorization process.

In order to monitor employees like Ms. Heney who obtained UAA to work at Waterford 3, Ms. Heney alleges that Entergy administers its own FFD program and implemented random urinalysis as part of that program.

A litany of regulations governs collecting urine specimens for testing, setting forth collector qualifications and responsibilities (10 C.F.R. § 26.85), urine specimen collection procedures (*id.* § 26.107), urine specimen quantity requirement (*id.* § 26.109), urine specimen acceptability check (*id.* § 26.111), and determining "shy" bladder (*id.* § 26.119). A few of these are implicated in Ms. Heney's allegations. For example, 10 C.F.R. § 26.85 articulates training standards and requires that licensees (like Entergy) only allow those who are "proficient" to serve as urine sample collectors.

Additionally, the collector must ensure the sample quantity is sufficient and the temperature of the specimen is within the required range. 10 C.F.R. § 26.109(a) obliges a urine specimen collector to ensure that the sample quantity is sufficient. "At a minimum," the specimen must be 30 mL "to ensure that a sufficient quantity of urine is available for initial and confirmatory validity and drug tests at a[ ] laboratory, and for retesting of an aliquot of the specimen if requested by the donor under § 26.165(b)." *See* 10 C.F.R. § 26.109(a); *see also* ECF No. 32 ¶¶ 80 (alleging that the fill line in the sample cup provided to Ms. Heney was at 50 mL), 81 (alleging the 30 mL "minimum" required by the regulation). If the specimen quantity is less than the minimum 30 mL, the collector must take various steps, including providing

guidance concerning the donor submitting to a "hydration process" to enable her to provide a specimen of sufficient quantity. 10 C.F.R. § 26.109(b).

The collector must "immediately" measure the urine specimen temperature. 10 C.F.R. § 26.111(a). If the specimen temperature is outside the acceptable range of 90 to 100 degrees Fahrenheit, "that is a reason to believe the donor may have altered (e.g., adulterated or diluted) or substituted the specimen" and the collector must contact the FFD program manager, who may consult with the MRO. 10 C.F.R. § 26.111(a), (c). If the temperature is out of range, the donor may be required to provide a second specimen. 10 C.F.R. § 26.111(c).

The regulations define subversion as "a willful act to avoid being tested or to bring about an inaccurate drug or alcohol test result for oneself or others at any stage of the testing process (including selection and notification of individuals for testing, specimen collection, specimen analysis, and test result reporting), and adulterating, substituting, or otherwise causing a specimen to provide an inaccurate test result." 10 C.F.R. § 26.5; ECF No. 32 ¶ 106.

Mindful of this regulatory backdrop, the Court turns to summarize the facts as alleged by Ms. Heney.

*Jade Heney's Work Performance and Working Conditions*

While earning her dual degrees and after her graduation from Nicholls State University, Ms. Heney worked as a Safety Technician for Sonoco-Sontheimer Offshore Catering Company, where she developed skills in federal and state safety

compliance and reviewed chemical usage across the company's offshore platforms.[10] Starting on January 27, 2020, Ms. Heney worked for Entergy, where she remained for approximately three years and eight months. Ms. Heney—a Health Physics and Chemistry specialist with over six years' experience—worked at Entergy's Waterford 3 facility as a Chemistry Technician.[11] An "experienced chemist," Ms. Heney established herself as a collegial and knowledgeable technician with a good work ethic.[12]

*Alleged Sexual Harassment*

Unfortunately, according to Ms. Heney, the Waterford 3 plant was marred "by a pervasive culture of sexual harassment[,]" which was "an almost daily occurrence."[13] Though male co-workers also participated in the harassment, Ms. Heney alleges that her direct supervisor, the Chemistry Supervisor, Jude Chenier, was the principal perpetrator, who treated his female subordinates like Ms. Heney differently than her male colleagues; Jude Chenier was hypercritical of Ms. Heney and other female employees whom he additionally "inappropriately sexualized."[14] Mr. Chenier allegedly overloaded Ms. Heney with work while "regularly 'mak[ing] degrading and off-color comments about Ms. Heney [and] regularly insinuat[ing] that Ms. Heney was not intelligent merely because she was a woman."[15] Ms. Heney alleges that the disparate treatment and harassment because of her sex created a hostile

---

[10] ECF No. 32 ¶¶ 10-11.
[11] *Id.* ¶¶ 9, 12.
[12] *Id.* ¶¶ 13-14 and IV. A.
[13] *Id.* ¶ 15.
[14] *Id.* ¶¶ 38-41; 45-57; 16-21.
[15] *Id.* ¶ 21.

work environment in which her male co-workers followed Mr. Chenier's lead in sexually harassing her.

In spite of this environment, Ms. Heney performed well and was promoted. In August 2023, she became Nuclear Health Physics and Chemistry Specialist-III in the Radiation Protection Department.[16] The hostile work environment, however, allegedly remained "the same" despite the new department, Radiation Protection, and her new supervisor, Michal Shymanski.[17]

### *Random Urinalysis*

Just two weeks after her promotion, on September 11, 2023, Ms. Heney was selected for a random on-site drug screen urinalysis. Mr. Shymanski told Ms. Heney that she was selected for a random onsite drug test that must be completed within minutes.[18]

### *The First Specimen*

Ms. Heney immediately proceeded to the onsite drug test.[19] Ms. Heney's urine specimen was collected and prepared for testing by Entergy administrative employee, Defendant Thelma Jenny Kraemer.[20] Chelse Chenier, FFD supervisor, was Ms. Kraemer's supervisor.[21] Ms. Kraemer was new to administering drug tests, having only begun unsupervised urine collections just two weeks prior on August 29, 2023,

---

[16] *Id.* ¶¶ 58-59.
[17] *Id.* ¶¶ 59-62.
[18] *Id.* ¶ 63.
[19] *Id.* ¶ 64.
[20] *Id.* ¶ 65.
[21] *Id.* ¶ 66.

after completing FFD Collector Training and Entergy employee supervision and training from August 22 to August 28, 2023.[22]

Ms. Kraemer asked Ms. Heney to give her all personal belongings and to provide a urine sample in a cup she provided.[23] Ms. Heney, wearing pants with no pockets, gave Ms. Kreamer her cell phone and her prescription medicine, Adderall, which Ms. Heney had brought in case Ms. Kraemer needed to view and document it as part of the test.[24] Because Ms. Heney had urinated shortly before being randomly selected for the test, she told Ms. Kraemer she doubted she would be able to produce a large enough sample. Ms. Kraemer told Ms. Heney to do her best to fill the cup to the specimen cup's 50mL fill line.[25]

Ms. Kraemer listened as Ms. Heney urinated in the stall and attempted to fill the cup; the two women laughed together as Ms. Heney attempted to reach the fill line with mere drops of urine.[26] As expected, the amount of urine Ms. Heney produced fell short of the fill line. Nevertheless, Ms. Kraemer took Ms. Heney's sample and advised her that it "should be enough[,]" though she failed to document the amount of urine in the specimen.[27]

In addition to failing to properly measure Ms. Heney's first urine specimen, Ms. Kraemer also failed to properly measure and record the urine specimen

---

[22] *Id.* ¶¶ 67-68.
[23] *Id.* ¶ 70.
[24] *Id.* ¶ 71-73.
[25] *Id.* ¶ 74.
[26] *Id.* ¶¶ 75-76.
[27] *Id.* ¶ ¶ 75-80, 83.

10

temperature.[28] After purportedly using a temperature gun to log the temperature of the specimen, Ms. Kraemer allegedly "wrote down a number on the custody and control form and checked that 'yes' the temperature was in the range of '90 to 100' degrees, then sealed the sample in a specimen vial without looking at what she wrote down."[29]  Within minutes, however, Ms. Kraemer reviewed her notes and told Ms. Heney that the temperature she logged did not look accurate, that it was "too low" at just 83.1 degrees Fahrenheit.[30] Ms. Kraemer then changed the form to indicate "no" the temperature was not in the standard range of "90 to 100" degrees.[31] Ms. Heney asked Ms. Kraemer if she could "double check" and retest the sample's temperature, but Ms. Kraemer indicated it was too late because the sample was sealed.[32] Ms. Kraemer admitted to Ms. Heney that she was not paying attention when taking the urine temperature, that the temperature was too low, that she was new and inexperienced, and that she would call her supervisor so that she and Ms. Heney could "learn together."[33]

Ms. Kraemer called her supervisor, Chelse Chenier, and Entergy Occupational Health Nurse, Donna McGriff, to the testing room for assistance. When they arrived, Ms. Kraemer admitted to Ms. Chenier, Ms. McGriff, and Ms. Heney that she was not

---

[28] *Id.* ¶¶ 1, 65-91, 95, 128, 134, 161, 169-70.
[29] *Id.* ¶ 82.
[30] *Id.* ¶ 84.
[31] *Id.*
[32] *Id.* ¶¶ 82, 84, 88.
[33] *Id.* ¶¶ 87, 89.

paying attention while taking the temperature nor was she paying attention to the number she wrote down on the form.[34]

*Hydration Process & Second Sample*

Ms. Heney was asked to stay for two hours for observation and to undergo the requisite "hydration process," in which Ms. Heney was given eight ounces of water every 30 minutes to produce a second sample. Ms. Heney complied. For this second urinalysis, Nurse McGriff asked Ms. Heney to produce a new urine sample, which she did after two hours of hydration. Nurse McGriff observed Ms. Heney as she urinated into the cup. Nurse McGriff determined that the second specimen was of sufficient quantity and was in the appropriate temperature range at 96.9 degrees Fahrenheit.[35]

*Results (negative for drugs), Investigation, and "Subversion" Finding*

At no time did anyone suggest that they thought Ms. Heney had engaged in any misconduct during the testing process. To the contrary, Ms. Kraemer repeatedly indicated that she herself had mishandled the collection and logging of the first specimen. For her part, Nurse McGriff advised Ms. Heney that she believed that Ms. Kraemer had erred on the first test by scanning the temperature of the inside of the cup of the first sample, rather than the temperature of the actual urine sample. Indeed, in a handwritten statement "also on September 11, 2024,"[36] Ms. Kraemer attested:

---

[34] *Id.* ¶¶ 90-91
[35] *Id.* ¶¶ 92-94.
[36] Typographical errors concerning the year confuse the matter but the Court assumes that the conduct forming the basis of this litigation occurred in the same year, whether 2023 or 2024: the

When giving a random test to Jade Heney, she stated she had just went to the restroom & may not have enough urine. After she went to restroom (under 4 mins) and placed cup on table I took temp of urine. It read 83.1. I held temp gun right over urine & temp was taken immediately after placing on table.[37]

Both samples were sent to QuestDiagnostics to be tested. Both tested negative for drugs.[38]

Nevertheless, after the test, from September 11 to September 19, Entergy investigated Ms. Heney and transferred her to a non-nuclear position. "[T]he same day" that Ms. Kraemer provided a written statement that Ms. Heney exhibited no suspicious activities from Ms. Heney during the urinalysis, Entergy's MRO, Dr. Andrew Monfee, determined that Ms. Heney had "subverted" the testing process due to a "refusal to test." To support his determination, Dr. Monfee reviewed written statements by Ms. Kraemer and Nurse McGriff and spoke to Ms. Chenier. Dr. Monfee memorialized his finding in a MRO Test Result Review Checklist. Though the checklist contemplates "collect[ing] the individual's written statement," Ms. Heney was not consulted despite remaining ready and willing to provide a statement.[39]

On September 19, Dr. Monfee wrote to Ms. Chenier that

conversations [ ] didn't suggest any suspicious activity other than below normal temperature on the first collected specimen. Ms. Chenier interviewed the donor and collector and both denied any regularities found during the collection. The second collection was conducted under direct observation with temperature in range and both resulted

---

drug tests and other relevant conduct are alleged to have occurred during the same time period and same year.

[37] *Id.* ¶¶ 95-97. In another written statement on September 19, 2023, Ms. Kraemer wrote that there was sufficient urine in the first sample but there was "no suspicious activities from" Ms. Heney during the urine selection process. *Id.* ¶ 100.

[38] *Id.* ¶¶ 92-95, 103-04.

[39] *Id.* ¶¶ 99-102.

negative. Based on this information I am dispositioning this as a refusal to test.

This "refusal to test" and "subversion" determination resulted in Ms. Heney's UAA being revoked. That same day, Ms. Chenier informed Ms. Heney that both of her September 11 urine samples tested 'negative' for drugs. Ms. Chenier then permanently revoked Ms. Heney's UAA for "Subversion of or Failure to Cooperate in the FFD Testing Process," due to the low temperature of her first negligently collected urine sample.[40]

### The Appeal

After Ms. Heney's UAA was revoked for "subversion,"[41] on September 20, Ms. Heney appealed, filed a complaint with Entergy, and complained to the Commission.[42] In her appeal, Ms. Heney contended that Ms. Kraemer's negligence and "human performance error" were the cause of the errant, low temperature and asked that the urine samples collected from her on September 11, 2023 be further tested to confirm that it was her urine, not a synthetic or altered alternative. Ms. Heney contended that the determination to suspend her resulted in her wrongful termination and cost her lost wages. Additionally, Ms. Heney filed a complaint about her wrongful termination via Entergy's Ethics Hotline; Entergy placed her on administrative leave. Ms. Heney also lodged a complaint with the Commission that

---

[40] *Id.* ¶¶ 1, 103-04.
[41] *Id.* ¶¶ 1, 103-04.
[42] *Id.* ¶¶ 1, 109-10.

Entergy violated Commission regulations by failing to properly test the temperature of her urine and revoking her access.[43]

Quest advised Ms. Heney that she had three days to request that her original urine samples be preserved, but when she contacted Quest to preserve the specimens so she could test them at her own expense to establish that the DNA matched her own for both tests (and to establish whether the first specimen was of sufficient quantity to properly test temperature), Quest advised that Entergy must lodge the preservation request. Ms. Heney contacted three Entergy coordinators and supervisors, requesting that they formally ask Quest to preserve the samples. She received no response.[44]

The day after Ms. Heney lodged her appeal, on September 21, Dr. Monfee rejected the appeal, noting: "does not change the original disposition of the drug test. The refusal to test is valid." A week later, Entergy hired Balch + Bingham LLP to investigate Ms. Heney's concerns raised in her appeal. Lewis Csedrik of Balch + Bingham interviewed Ms. Heney. This was the first time anyone affiliated with Entergy had asked her about the test since she was placed on administrative leave.[45]

During the investigation, Ms. Heney reported to Mr. Csedrik that Entergy failed to properly test the temperature of her first urine specimen and that Entergy had had the same problem with other drug tests. When Mr. Csedrik interviewed Matthew Deignan, Superintendent of Security Programs (and one of three

---

[43] *Id.* ¶¶ 109-117.
[44] *Id.* ¶¶ 108, 114-116.
[45] *Id.* ¶¶ 120-22.

individuals Ms. Heney had asked to preserve the Quest-tested urine samples), Mr. Deignan admitted that Entergy was the only party authorized to request that Quest conduct additional testing of Ms. Heney's urine and that they chose not to do so. Mr. Deignan also stated that Entergy refused to request that Quest even retain the urine samples. As a result, Quest destroyed the samples.[46]

Mr. Csedrik reported to Entergy his findings. In his report, he outlined the impact of deficiencies in Entergy's documentation processes as follows:

> Notwithstanding this, the investigation also found that the actual or approximate amount of a donor's specimen is not recorded in any of the paperwork used to document the donor's specimen, including the Custody and Control Form. The absence of such a record makes it more difficult to establish whether the required amount of urine was provided, which could be important in situations such as Ms. Heney's where the donor or someone else has questions regarding the sufficiency of the volume of the specimen.

Mr. Csedrik found that Entergy's "records associated with the collection process omit relevant information, namely the time at which the temperature of the specimen is measured." Mr. Csedrik also identified issues in Entergy's "collection process that cast at least some doubt on the accuracy of the temperature of Ms. Heney's specimen," including that procedures and training materials do not identify the instruments to be used for measuring temperature or how the instruments should be used and, further, that collectors are not required to: identify the time at which the specimen's temperature is measured or the volume of the specimen; measure the specimen's temperature more than once to conform accuracy, even if it is out of range. Mr.

---

[46] *Id.* ¶¶ 123-24.

Csedrik concluded that "[t]hese and other findings below warrant consideration by Entergy's Medical Review Officer (MRO) in connection with the review of Ms. Heney's Appeal Letter."[47]

Even though he had concerns about the temperature taking and recordation process, and despite Mr. Csedrik's findings and recommendations, Dr. Monfee did not reinstate Ms. Heney's UAA. On November 9, 2023, Mr. Csedrik told Ms. Heney that the "investigation didn't establish that there was an error, but [neither did it] confirm that there was subversion involved[,] which I think is important to some degree for the purpose of your pending appeal." Because Entergy predicated its decision to permanently revoke Ms. Heney's UAA based on "subversion," Mr. Csedrik's determination that the out-of-range temperature was not the result of subverting the collection process should have resulted in Entergy reinstating both her UAA and her employment, Ms. Heney alleges. Still, on December 6, 2023, Entergy upheld its decision to revoke Ms. Heney's UAA for subversion and to terminate her employment.[48]

Entergy input into PADS that Ms. Heney's UAA was revoked, resulting in her being banned from working in the nuclear industry. Only Entergy's MRO can reverse this decision; he has refused to do so despite Ms. Heney's requests. This ban has resulted in Ms. Heney being denied jobs in other nuclear facilities. Ms. Heney has

---

[47] *Id.* ¶¶ 125-30.
[48] *Id.* ¶¶ 131-36.

been unable to secure a comparable position in the nuclear industry and has been unable to earn the same wages.[49]

*This Lawsuit*

This lawsuit—originally filed in state court—followed. Jade Heney initially sued her former employer, Entergy Operations, Inc., alleging discrimination in employment based on sex as well as sexual harassment in violation of the Louisiana Employment Discrimination Law, La. R.S. 23:301-369; she additionally alleged negligence as well as *respondeat superior*, and evidence spoliation (for failure to preserve the urine specimens which have since been destroyed). Entergy removed the case and moved to dismiss the negligence, *respondeat superior*, and spoliation of evidence claims as barred by the Louisiana Workers' Compensation Act. Ms. Heney amended her complaint to clarify that she did not suffer any mental or physical injury from the termination of her employment; rather, she seeks to recover economic losses on her negligence-based claims, specifically alleging that Entergy was at fault for terminating her employment "based on the negligently collected and documented specimen, permanently revoked her [Unescorted Access Authorization], and inputted that revocation in the Personnel Access Authorization Program system[.]"[50] Ms. Heney also added the urine specimen collector, Thelma Kraemer, as a defendant and asserted a negligence claim against her former co-worker.

Entergy withdrew its prior motion to dismiss. It moved to dismiss the amended complaint's amended negligence, *respondeat superior*, and spoliation claims, this time

---

[49] *Id.* ¶¶ 138-39.
[50] ECF No. 15 ¶ 148.

predicating dismissal on Louisiana's employment-at-will doctrine. Plaintiff requested and was granted another opportunity to amend her complaint.[51]

In her second amended complaint, Ms. Heney added to her state-law employment discrimination claim a gender discrimination/sexual harassment claim under Title VII, 42 U.S.C. § 2000e, *et seq*. Ms. Heney continues to allege facts underlying negligence, *respondeat superior*, and spoliation claims.

Simply put, Ms. Heney alleges that Ms. Kraemer mishandled the collection of her first urine sample, in that she failed to properly measure the volume and temperature of her urine specimen and thus reported an incorrect temperature that was below the acceptable range. She further alleges that Ms. Kraemer's negligence and the negligent review process that followed ultimately resulted in Entergy firing Ms. Heney after its Medical Review Officer (Dr. Andrew Monfee) negligently investigated her appeal and negligently determined and reported that she had subverted Entergy's drug screen selection process. Ms. Heney alleges that Ms. Kraemer's and Entergy's negligence also caused her to be banned from employment in the nuclear field.

Invoking Louisiana's employment-at-will doctrine, Entergy now moves to dismiss in part the second amended complaint, targeting for dismissal Ms. Heney's state-law negligence, *respondeat superior*, and evidence spoliation claims.[52] Entergy contends that Louisiana's employment-at-will doctrine bars Ms. Heney from

---

[51] ECF Nos. 11, 15, 21, 23.
[52] Entergy does not seek to dismiss Plaintiff's sexual harassment claims under federal and state law.

recovering against Entergy directly and vicariously for terminating her employment based on an allegedly negligent drug test. Entergy contends that the *respondeat superior* claim likewise fails because Ms. Heney fails to allege facts that state a viable underlying negligence claim against the specimen collector, Ms. Kraemer. Finally, Entergy contends that the spoliation claim is derivative of her negligent and *respondeat superior* claims which fail and thus the spoliation claim must be dismissed.[53] Like Entergy, Ms. Kraemer moves to dismiss Ms. Heney's negligence claim as barred by Louisiana's doctrine of employment-at-will. Ms. Kraemer additionally invokes the Louisiana Worker's Compensation Act, Louisiana's general rule of tort immunity granted to employers and co-employees of a person injured in a work accident due to employer/co-employee negligence.[54]

## II.   LAW AND ANALYSIS

### A.  Rule 12(b)(6) Legal Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations

---

[53] ECF No. 36.
[54] ECF No. 43.

of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true." *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

In resolving a motion to dismiss, the Court is generally "limited to the contents of the pleadings, including any attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citation omitted). However, there are two limited exceptions to this general rule in which the Court may rely on evidence beyond the complaint without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2014)). First, the Court "may consider 'any documents attached to the motion to dismiss that are central to the claim and referenced [or incorporated] in the complaint.'" *See PHI Grp.,*

21

*Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 841 (5th Cir. 2023) (citation omitted). Second, the Court may consider "a matter subject to judicial notice under Federal Rule of Evidence 201." *George*, 36 F.4th at 619.[55]

### B. The Substantive Law

#### 1. Negligence: The Scope of General Tort Liability Is Broad.

Tort liability in Louisiana is predicated on statute. Civil Code Article 2315, Louisiana's source of negligence liability, instructs that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code Art. 2315(A). Article 2315's focus on the concept of fault is to be considered together with Article 2316, which supplies a standard of care: "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La. Civ. Code Art. 2316. In accordance with these general negligence principles, actionable negligence results from creating an unreasonable risk of harm to another such that "a plaintiff is allowed to assert a claim against a party who has caused him or her harm." *Martin v. Thomas*, 2021-1490 (La. 6/29/22), 346 So. 3d 238, 242.

---

[55] If the Court considers materials outside the pleadings which are not central to the claim or subject to judicial notice, then the motion to dismiss must be converted into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *see also Kennedy v. Chase Manhattan Bank USA*, 369 F.3d 833, 839 (5th Cir. 2004). If conversion to summary judgment is appropriate, the Court must notify the parties, then consider all evidence presented. *See* Fed. R. Civ. P. 12(d); *see also Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

### a. The Duty-Risk Analysis

Taking into account the conduct of each party and the circumstances of each case, Louisiana courts employ a duty-risk analysis to determine whether to impose liability based on these broad negligence principles. *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006). Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Id.* at 633. The threshold element—whether a duty exists—is an issue of law for the Court to decide. *Evans v. Abubaker, Inc.*, 2023-955 (La. 5/10/24), 384 So. 3d 853, 858. Even so, whether a legal duty exists, and the extent of protection owed a particular plaintiff, is case-specific, as it depends on the facts and circumstances of the case and the relationship of the parties. *See Doe v. McKesson*, 21-929 (La. 3/25/22), 339 So.3d 524, 544; *see also Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) (citation omitted) ("The existence of a duty . . . 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'").

The touchstone of tort liability is reasonableness. "All persons have a general duty to act in a reasonable fashion so as to avoid harming others. Therefore, negligence generally is found to exist when a tortfeasor knows or should have known that his behavior has created an unreasonable risk, which is reasonably foreseeable

23

to damage another, yet the tortfeasor does not alter his behavior to avoid the harm." *Spencer v. Red River Lodging*, 37,930 (La. App. 2 Cir. 2/5/04), 865 So. 2d 337, 341 (internal citation omitted). For example, in the employment context generally, "[t]he duty owed to [an employee] by her employer is one of reasonableness under the totality of the circumstances." *Ross v. Property Plus, Inc.*, 99-100 (La. App. 5 Cir. 6/30/99), 738 So. 2d 159, 161 (citation omitted); *see also Bailey v. Pinnacle Polymers, LLC*, 24-490 (La. App. 5 Cir. 4/2/25), 412 So. 3d 1063, 1074 (observing that an employer owes a duty to exercise reasonable care for the safety of his employees). Further, "[i]n the [specific] context of negligent hiring, retention, and supervision claims, 'a duty to exercise reasonable care in the selection of [an] employee' arises when 'an employee . . . in the performance of his duties will have a unique opportunity to commit a tort against a third party.'" *Gomez v. Galman*, No. 24-30207, 2025 WL 1099698, at *2 (5th Cir. 2025) (citing *Gomez v. Galman*, 18 F.4th 769, 780 (5th Cir. 2021)).

### b. *Respondeat Superior*

Civil Code Article 2317's vicarious liability provision states: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." In this regard, vicarious liability provides an *additional* source of recovery for negligence. For example, a plaintiff may seek to hold a tortfeasor employee who acts in the course and scope of employment liable for negligent conduct, as well as seek to hold the tortfeasor's employer vicariously liable. *See Tobin v. Lab'y*

24

*Corp. of Am.*, No. 15-1731, 2015 WL 13543988, at \*2 (E.D. La. Oct. 21, 2015) (observing that "the Court is not persuaded that naming the alleged primary tortfeasor as a defendant in this action is entirely unnecessary" and rejecting the argument that pursuing vicarious liability rendered the employee's presence in the lawsuit unnecessary). Civil Code Article 2320, Louisiana's *respondeat superior* doctrine, provides, in part, that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed" and "responsibility only attaches, when the masters or employers . . . might have prevented the act which caused the damage, and have not done it." To be sure, "an employer is not only responsible for his or her own tortious conduct but also for that of an employee in the exercise of the function of the employment." *Martin v. Thomas*, 2021-01490 (La. 6/29/22), 346 So. 3d 238, 243.

### 2. The Employment Context: Limits on and Scope of an Employer's and Co-Employee's Tort Liability.

When a general law and a specific law address the same subject matter, as a matter of statutory construction, the more specific legislative enactment governs. *See, e.g., Kennedy v. Kennedy*, 699 So. 2d 351, 358 (La. 1996). For example, in cases of employment discrimination, Louisiana has developed a statutory scheme to govern such that a plaintiff's state law remedies are limited to those permitted by the claim-specific Louisiana Employment Discrimination Law, rather than the broad, general tort remedy of Article 2315. *Cf. Roberson-King v. Louisiana Workforce Comm'n*, 904 F.3d 377, 380 (5th Cir. 2018) (employee could not state racial discrimination claim under Louisiana's general tort statute); *Gluck v. Casino America, Inc.*, 20 F. Supp. 2d

991, 995 (W.D. La. 1998) (adopting magistrate judge's report and recommendation, granting employer's motion to dismiss general negligence claims in favor of specific statutory redress available for age discrimination, and noting that "[t]his opinion should not be read to mean that an employee may never state a claim against an employer under Article 2315[]").

The broad scope of general tort liability is limited by other doctrines as well, particularly in the employment context. For example, Louisiana embraces an employment-at-will doctrine as the default employment status. Employment relationships are contractual in nature, rendering employers and employees free to negotiate terms which are not prohibited by law or public policy. *Quebedeaux v. Down Chemical Co.*, 2001-2297 (La. 6/21/02), 820 So. 2d 542, 545. "When the employer and employee are silent on the terms of the employment contract, the [ ] default rule of employment-at-will [applies]." *Id.*

At-will employment is articulated thusly (and "archaically") in the Civil Code: "A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for doing so. The servant is also free to depart without assigning any cause." *See* La. Civ. Code art. 2747; *see also Hayes v. Univ. Health Shreveport, LLC*, 2021-01601 (La. 1/7/22), 332 So. 3d 1163, 1165 n.1; *see also Danna v. Ritz-Carlton Hotel Co.*, LLC, 2015-0651 (La. App. 4 Cir. 5/11/16), 213 So. 3d 26, 32 (citation omitted).

This means that employers may "end the employment relationship at any time, and for any reason, without liability, provided that the termination violates no

26

statutory or constitutional provision and, obviously, that there is no contract of employment for a definite term." *See Johnson v. Delchamps, Inc.*, 897 F.2d 808, 810 (5th Cir. 1990); *see also Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 403 (5th Cir. 2000). So applied, the at-will employment doctrine immunizes employers from wrongful termination claims.

The Louisiana Worker's Compensation Act ("LWCA") confers immunity on employers insofar as it provides the exclusive remedy for employees that are injured, suffer a disease, or rendered disabled in workplace "accidents" or due to a co-employee's negligence. *See* La. R.S. § 23:1021.1; La. R.S. § 23:1032(A)(1)(a) ("Except for intentional acts provided for in Subsection B, the rights and remedies herein granted to an employee or his dependent on account of an injury . . . shall be exclusive of all other rights, remedies and claims for damages."); *see also Duncan v. Wal-Mart Louisiana, L.L.C.*, 863 F.3d 406, 408 n.1 (5th Cir. 2017) ("The exclusivity provision of [the LWCA] would usually bar an employee's suit for negligence against her employer because the worker's compensation remedy 'shall be exclusive of all other rights, remedies, and claims for damages.' La. R.S. § 23:1032(A)(1)(a). But the loss of an unborn child is not an 'injury' that the Act covers." (citing *Adams v. Denny's Inc.*, 464 So.2d 876, 877 (La. App. 4 Cir. 1985)). An "accident" is defined as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La. R.S. § 23:1021(1). "Injury" or "personal injuries" are defined as

27

"only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom" as well as certain limited "mental injuries[.]" La. R.S. § 23:1021(8)(a)-(c).

### 3. Spoliation

"The Louisiana tort of spoliation of evidence is a cause of action for intentional destruction of evidence to deprive an opposing party of its use." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) (citation omitted); *but see Hodges v. Mosaic Fertilizer LLC*, 289 F. App'x 4, 7 (5th Cir. 2008) (unpublished) (observing, in dicta, that the Louisiana Supreme Court had yet to address whether Louisiana recognizes an independent tort for intentional spoliation of evidence or whether the LWCA would preclude an employee from bringing such a claim against his employer).

The three elements of a spoliation claim are: (1) the spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted in bad faith. *Coastal Bridge Co., LLC v. Heatec, Inc.*, 833 F. App'x 565, 573-74 (5th Cir. 2020) (citing *Port of S. La. V. Tri-Parish Indus.*, 927 F. Supp. 2d 332, 346 (E.D. La. 2013)) (noting that the doctrine authorizes the trial court to sanction the responsible party).

### C. The Employment-At-Will Doctrine Bars Plaintiff's Wrongful Termination Claim.

Both Defendants invoke the employment-at-will doctrine, contending that it bars Ms. Heney from recovering against Ms. Kraemer or Entergy directly and

28

vicariously for terminating her employment based on an allegedly negligently conducted drug test. The Court agrees that Ms. Heney cannot state a claim for negligent termination and any such claim and attendant remedy shall be dismissed with prejudice.

Insofar as Ms. Heney seeks to recover for negligent or wrongful termination, Louisiana's at-will employment doctrine dooms any such claim or remedy. As a threshold matter, Ms. Heney alleges no facts that would remove her employment with Entergy from the at-will paradigm. Accordingly, the default rule of Article 2747 applies such that Entergy was authorized to terminate her employment at any time without reason.

*Johnson v. Delchamps, Inc.*, 897 F.2d 808, 810 (5th Cir. 1990) reinforces that Ms. Heney's wrongful termination theory cannot withstand application of the general at-will employment doctrine. In *Johnson*, the Fifth Circuit held (albeit on summary judgment) that an employer cannot be held liable in tort for discharging an at-will employee based on incorrect information gathered during a polygraph examination, even if the test was negligently conducted. *Id.* "If [an employer] was at liberty to discharge [its employee] for no reason," the court reasoned, "it was equally at liberty to discharge [her] for a reason based on incorrect information, even if that information was carelessly gathered." *Id.* (assuming for the purposes of summary judgment that the polygraph examination was negligently administered and affirming summary judgment in favor of defendant).

Applying Civil Code Article 2747 and *Johnson,* an employee's claim against her former employer for negligent or wrongful termination fails as a matter of law. *Accord Herbert v. Placid Ref. Co.*, 564 So. 2d 371, 373-74 (La. App. 1st Cir. 1990), *writ denied,* 569 So. 2d 981 (La. 1990) (applying *Johnson* in dismissing claim against employer based on employee's termination resulting from testing laboratory's negligent performance of drug test and further observing that "Louisiana does not recognize a cause of action for negligent interference with contract rights"); *Scott v. Crosby Energy Servs.*, No. 19-12736, 2020 WL 1139854, at *6 (E.D. La. Mar. 9, 2020) (applying *Johnson* to dismiss negligent termination claim alleged against employer based on drug test administered by non-employer); *Smith v. Diamond Offshore Mgmt. Co.*, No. 03-2024, 2003 WL 23095586, at *6 (E.D. La. Dec. 23, 2003) (applying *Johnson* to dismiss the plaintiff's claim for negligent discharge against employer based on results of breathalyzer test administered in unreliable manner); *cf. Wells v. DISA Glob. Sols. Inc.,* 2018 WL 3827590, at *7 (W.D. La. June 28, 2018), *report and recommendation adopted,* 2018 WL 3827264 (W.D. La. Aug. 10, 2018) (determining that company that neither collected nor analyzed drug test sample may not be held liable under negligence theory for failure to conduct test properly or produce correct results); *cf. Sanchez v. Georgia Gulf Corporation*, 2002-0904 (La. App. 1 Cir. 11/12/03), 860 So. 2d 277, 282-84 (finding that employer was entitled to summary judgment dismissing at-will employee's wrongful termination claim predicated on employer's failure to comply with Louisiana drug testing statute which resulted in positive drug test).

So too here. Entergy had "the right to fire [Ms. Heney] for any reason—good, bad, or indifferent—or for no reason at all." *See Johnson*, 897 F.2d at 810. That Entergy fired Ms. Heney after its own allegedly mishandled drug test is as acceptable a reason under the law as firing her for no reason at all.[56] Louisiana's at-will employment doctrine thus compels dismissal of Ms. Heney's negligent termination theory of recovery against both Defendants. Accordingly, Ms. Heney is precluded from pursuing certain forms of relief requested insofar as such relief was premised on her wrongful termination theory, including reinstatement of employment, back pay, or damages associated with her termination.[57]

### D. Plaintiff Alleges a General Negligence Claim.

In addition to the wrongful termination theory—which is barred by the employment at-will doctrine—Ms. Heney additionally alleges that Ms. Kraemer's inexperience, negligent collection, and mishandling of the drug test, compounded by the negligence of the MRO and other Entergy personnel in their review of the collection procedures and investigation of Ms. Kraemer's negligence and in mishandling the review/appeal of its "subversion" finding, caused Ms. Heney to pay the ultimate price—banishment from working in the nuclear industry. "As a result," Ms. Heney alleges, she "has been unable to get a comparable position in the nuclear industry and has been unable to earn the same wages she earned as a nuclear

---

[56] Ms. Heney appears to concede as much. ECF No. 39 at 4.
[57] *See generally* ECF No. 32 ¶¶ 185-195.

31

worker."[58] Notably, Ms. Heney could pursue analogous general negligence claims against an independent drug testing laboratory or collector. Though ostensibly an extension and/or novel theory to pursue against an employer and co-employee, at the pleadings stage, insofar as Ms. Heney's relief is limited accordingly, the Court finds that Ms. Heney has stated a general negligence claim under Articles 2316, 2316, and the duty-risk analysis. And, such a claim is not barred by the LWCA.

*The LWCA Is Not Implicated on the Alleged Facts*

Entergy and Ms. Kraemer move to dismiss *in toto* Ms. Heney's negligence claims. Entergy predicates dismissal solely on the employment-at-will doctrine. For her part, Ms. Kraemer additionally argues that dismissal is warranted because Ms. Heney's exclusive remedy for any negligence claim is through the LWCA. Entergy abandoned this argument in its latest motion to dismiss. Ms. Kraemer presses it, but it finds no traction on the alleged facts. Considering that there is no workplace accident that caused physical (or defined mental) injury to Ms. Heney, any residual general negligence claim is not doomed by the LWCA because Ms. Heney's allegations are beyond the scope of the exclusive remedy articulated therein. Accordingly, the LWCA is of no impediment to Ms. Heney's general negligence theory. To be sure, the defendants may advance this and any number of defenses to and challenges of Plaintiff's circumscribed general negligence claim.

---

[58] ECF No. 32 ¶ 139 (alleging that, "[i]n March 2024, the Palo Verde Nuclear Generating Station in Arizona rescinded a job offer it made to Ms. Heney, noting that its reason . . . was Entergy's note in the Personnel Access Authorization Program system that Ms. Heney's UAA was revoked").

*Negligence in the Collection of Urine Samples and Review of Processes*

Turning to consider whether Ms. Heney alleges a general negligence theory of recovery against Ms. Kraemer and/or Entergy, Ms. Kraemer acknowledges that negligent drug testing causes of action are viable when brought against independent testing facilities. Still, Ms. Kraemer resists Ms. Heney's attempt to state a claim on a broader negligence theory because Ms. Heney fails to cite a case based on the precise facts alleged here.

Ms. Heney contends in her opposition that she alleges facts supporting actionable negligence by Entergy and/or Ms. Kraemer beyond the doomed wrongful termination theory, including: negligently training, supervising, and implementing unreasonable and unreliable collection procedures, negligently collecting and documenting Ms. Heney's urine specimen, negligently reviewing and investigating the results of Ms. Heney's specimen collection, and negligently reviewing and investigating Ms. Heney's complaints regarding the specimen which led to revocation of her UAA. And, further, Ms. Heney contends that she alleges negligent conduct after her termination when Entergy permanently revoked her UAA and published that revocation in PADS, which has resulted in her being permanently banned from the nuclear industry. Ms. Heney insists that Entergy's and Ms. Kraemer's conduct which harmed her resulted from negligent collection, recordation, and review of its collection procedures, as well as Ms. Heney's mishandled appeal and the negligent training and supervision of the involved employees.

33

For its part, Entergy downplays these alleged facts and Ms. Heney's resort to a broader negligence theory. Entergy appears to concede that Ms. Heney may indeed allege facts that support the elements of a negligence claim.[59] Entergy nevertheless argues (correctly) that Ms. Heney has no private cause of action for any alleged violations of federal regulations. Otherwise, however, Entergy resorts to policy reasons condemning any attempt by Ms. Heney to state a negligence claim against her former employer because any such claim would simply be a repackaged negligent termination theory barred by the employment-at-will doctrine. But Entergy stops short of engaging either with: the reality that Ms. Heney's allegations go beyond her doomed negligent termination theory and remedy; or the Louisiana substantive law invoked by Ms. Heney and acknowledged by Ms. Kraemer.[60] That is, courts have held that independent testing laboratories and/or specimen collectors owe a duty of reasonable care to employees who are tested. To be sure, whether such a duty may be imposed on the employer and a co-employee who undertakes the collection processes appears to be a novel question, likely because an at-will employee's redress is limited (*i.e.,* at-will employee is precluded from recovering for negligent termination). At the pleadings stage, however, applying Louisiana's general negligence principles (Articles 2315 and 2316) to Ms. Heney's allegations challenging the validity and

---

[59] ECF No. 40 (arguing that Entergy does "not seek to dismiss Plaintiff's negligence claim because she did not allege the elements of a negligence claim; it moved to dismiss the claim because it is legally barred by Louisiana's employment-at-will doctrine" and further arguing that "regardless of whether Plaintiff can allege, and ultimately prove, Ms. Kraemer acted negligently in administering her drug test, Plaintiff's negligence claim against [it] for her job loss and the attendant harm she claims she suffered is not cognizable").

[60] ECF No. 43-1 at 6-7.

integrity of the random drug testing processes and review processes that followed, which culminated in permanent revocation of her UAA and effective banishment from the nuclear industry, Ms. Heney has stated a general negligence claim as an extension of the duty recognized in the case law.

A sample collector for drug testing purposes has a duty to use reasonable care in collecting and maintaining the integrity of the sample. *See Bass v. DISA Global Solutions, Inc.*, 2024-24 (La. App. 1 Cir. 7/24/24), 395 So. 3d 1196, 1200 (citing *Williams v. Gulf Coast Occupational Medicine, Inc.*, 2015-1130 (La. App. 1 Cir. 2/26/16), 2016 WL 770376, at *5 n.5, *writ denied*, 2016-0577 (La. 5/13/16), 191 So. 3d 1056)). Indeed, courts have recognized that drug testing collectors and/or laboratories have a duty to the employee/test subject to conduct drug tests in a competent and reasonable manner. *Accord  Elliott v. Lab. Specialists, Inc.*, 588 So. 2d 175, 176 (La. App. 5 Cir. 1991), *writ denied*, 592 So. 2d 415 (La. 1992) ("find[ing] that drug testing laboratories (acting as independent contractors) owe a duty of care to the testee/employee, regardless of the contractual arrangement between the lab and the employer" and observing that the plaintiff having been "labelled an illegal drug user has such an emotional economic and career detrimental [e]ffects that failure to find protection under our law would be a step backwards"); *Nehrenz v. Dunn*, 593 So. 2d 915, 918 (La. App. 4th Cir. 1992) (holding that employee stated a general negligence claim against laboratory based on breach of duty to perform tests in competent and nonnegligent manner); *Scott v. Crosby Energy Servs.*, No. 19-12736, 2020 WL 1139854, at *6 (E.D. La. Mar. 9, 2020) ("To the extent plaintiff claims that Advance

35

negligently administered and processed his drug test, negligently drafted deficient policies and practices for authentic drug testing, and/or negligently communicated false drug test results to Scott's employer, Louisiana state and federal courts have recognized that drug testing laboratories have a duty to conduct drug tests in a competent and reasonable manner."); *Smith v. Diamond Offshore Mgmt. Co.*, No. 03-2024, 2003 WL 23095586, at *7 (E.D. La. Dec. 23, 2003) (observing that testing laboratories hired by an employer owe a duty of reasonable care to employees who are tested); *LeBlanc v. DISA Glob. Sols., Inc.*, No. 17-76, 2017 WL 5147660, at *8 (M.D. La. Oct. 5, 2017), *report and recommendation adopted*, 2017 WL 5147150 (M.D. La. Nov. 6, 2017) (observing that "[c]ertainly, it would seem that [a specimen-collector] would owe a duty, for example to ensure that the proper sample is actually the one sent to the testing facility"); *Jones v. DISA Glob. Sols., Inc.*, No. 17-1058, 2018 WL 3150716, at *4 (M.D. La. June 11, 2018), *report and recommendation adopted*, 2018 WL 3150349 (M.D. La. June 27, 2018) (same).

Here, Ms. Heney alleges that Defendants owed her such a duty of reasonable care. That is, Ms. Heney alleges that, even though Entergy employees admitted that Ms. Kraemer erred in measuring and recording the first specimen's temperature[61] and even though Ms. Heney committed no willful acts to impact the results of her random drug test,[62] and even though the investigator Entergy hired to investigate Ms. Heney's appeal reported to Entergy that its training and collection process was

---

[61] *Id.* ¶¶ 1, 85, 87, 95, 128.
[62] *Id.* ¶¶ 1, 107.

36

flawed and that Entergy's "subversion" finding could not be confirmed,[63] Entergy terminated Ms. Heney and revoked her UAA based on Ms. Kraemer's errors.[64] And, Dr. Monfee upheld his decision to permanently revoke Ms. Heney's UAA.[65] Entergy published the UAA revocation in the PADS, resulting in Ms. Heney being permanently banned from working in the nuclear industry.[66]

Again, the Court acknowledges that such a claim *as stated against an employer* is an extension of the above summarized principles. Indeed, the Court is skeptical as to whether Ms. Heney may prove her general negligence claim in seeking redress for the mishandling of her random drug test and resulting review which led to her banishment from working in the nuclear field, particularly under these unique circumstances implicating federal regulatory mandates. *Cf. Pasternack v. Laboratory Corporation of America Holdings*, 839 F.3d 151, 152 (2d Cir. 2016) (affirming district court's judgment dismissing claims for mishandling a random drug test brought by plaintiff against drug testing company and program administrator, on the basis of answers to questions certified to the New York Court of Appeals, which held that drug testing regulations and guidelines promulgated by the Federal Aviation Administration and Department of Transportation do not implicate the scientific integrity of the testing process and thus do not create a duty of care for drug testing laboratories and program administrators under New York negligence law). But this

---

[63] *Id.* ¶¶ 1, 126-30, 134-35, 162.
[64] *Id.* ¶¶ 1, 104, 136, 162, 169.
[65] *Id.* ¶¶ 1, 136.
[66] *Id.* ¶¶ 1, 138-39, 162, 167, 169, 170, 177.

is the pleading stage and neither Defendant has satisfied its/her burden to show that Ms. Heney's general negligence claim is implausible as alleged.

Accordingly, at this stage of the litigation in which the Court accepts all well-pled facts as true and construes all reasonable inferences in the complaint in the light most favorable to Ms. Heney, and considering the Civil Code's broad conception of fault, Ms. Heney has alleged a plausible claim for relief against Ms. Kraemer and Entergy as specimen collectors for their mishandling of her drug test and the negligent review process that followed, with the proviso that any remedies shall be limited—Ms. Heney may not seek nor may she be granted any relief tethered to her dismissed negligent termination theory. Defendants' motions to dismiss Ms. Heney's general negligence theory are denied.

Insofar as Entergy moves to dismiss Ms. Heney's *respondeat superior* theory of recovery, the motion is denied. As a threshold matter, Ms. Heney's *respondeat superior* claim encompasses more than her negligence cause of action. Furthermore, Ms. Heney advances detailed factual allegations supporting her theory that Entergy was negligent, directly and vicariously (through Ms. Kraemer and others). Though Entergy contends that Ms. Heney failed to allege that either Ms. Chenier or Dr. Monfee acted negligently, this argument is belied by the second amended complaint's allegations.[67] Entergy's motion to dismiss the *respondeat superior* cause of action is denied.

---

[67] *See, e.g.,* ECF No. 32 ¶¶ 173-78.

### E.  Plaintiff Has Stated a Spoliation Claim.

Finally, Entergy moves to dismiss Ms. Heney's spoliation claim.

Ms. Heney alleges that Entergy intentionally destroyed Ms. Heney's urine specimens to deprive her of using them in litigation, after Ms. Heney submitted her internal appeal and requested that Entergy—the only party with the authority to request preservation—preserve the specimens.[68] Had Entergy preserved the urine specimens, Ms. Heney contends, the samples could confirm the volume of the first specimen and that both constituted her undiluted urine.[69] Entergy moves to dismiss Ms. Heney's spoliation claim on the grounds that the claim relates to her negligence and *respondeat superior* claims, which must be dismissed by application of the employment-at-will doctrine. Because Ms. Heney has stated a general negligence claim beyond the negligent termination claim that shall be dismissed and, further, because Ms. Heney alleges that Entergy intentionally destroyed the urine specimens, Entergy's request to dismiss the spoliation claim at this stage must be denied.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that Entergy's partial motion[70] to dismiss is hereby **GRANTED IN PART** (as to the negligent termination claim) **and DENIED IN PART** (as to general negligence, *respondeat superior*, and spoliation claims).

---

[68] ECF No. 32 ¶¶ 114-16, 123-24, 179-84.

[69] *Id.* ¶¶ 109-117.

[70] ECF No. 36.

**IT IS FURTHER ORDERED** that Defendant Kraemer's motion[71] to dismiss is **GRANTED IN PART** (as to the negligent termination claim) **and DENIED IN PART** (as to the general negligence claim).

**IT IS FURTHER ORDERED** that Plaintiff's negligent termination claim is **DISMISSED WITH PREJUDICE** as barred by the employment-at-will doctrine.

**IT IS FURTHER ORDERED** that, within 21 days, Defendants shall file answers to the second amended complaint.

New Orleans, Louisiana, this 23rd day of July, 2026.

　　　　　　　　　　　　　　　　　BRANDON S. LONG
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[71] ECF No. 43.